# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 14-706V
Filed: October 30, 2023

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | | |
| KATHLEEN WYATT, | * | |
| | * | |
| Petitioner, | * | Attorneys' Fees and Costs; |
| v. | * | Reasonable Basis. |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | | |

*Braden A. Blumenstiel, Esq., The Law Office of DuPont & Blumenstiel, Dublin, OH, for petitioner.*
*Alexis B. Babcock, Esq., U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

On August 5, 2014, Kathleen Wyatt ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"). Petitioner alleged that she received a Fluarix vaccine on October 1, 2012, and within a few days, began to feel "joint pain in lower and upper extremities, radiating to upper torso affecting [activities of daily living] caused by the Fluarix, the flu vaccine." *See* Petition ("Pet.") at 1, ECF No. 1. Petitioner claims she had continuing symptoms related to the flu vaccine including weakness, numbness, and tingling in her upper and lower extremities. *Id.*

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or on https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

1

On December 17, 2018, petitioner's claim was dismissed for failure to prove that she suffered from a defined and recognized injury and failure to satisfy the six-month severity requirement. *See* ECF No. 106. A Motion for Review of the Decision dismissing petitioner's petition was denied by the United States Court of Federal Claims. *See* ECF Nos. 108, 111. Thereafter, petitioner filed an appeal. ECF No. 113. On September 8, 2020, the Court of Appeals for the Federal Circuit affirmed the undersigned's decision and the Federal Court of Claims' denial of petitioner's Motion for Review. *Wyatt v. Sec'y Health & Human Servs.*, 825 F. App'x 880, 888 (Fed. Cir. 2020).

Petitioner filed a Motion for Final Attorney's Fees and Costs ("Motion for Final Fees") on March 29, 2021. Motion for Final Fees, ECF Nos. 128-29. Respondent filed his Response to petitioner's Motion for Fees raising reasonable basis. Response, ECF No. 133. On June 28, 2021, petitioner filed her reply. ECF No. 134. After an inquiry from chambers, petitioner filed the supporting documentation for attorneys' fees and costs associated with James Blumenstiel ("J. Blumenstiel") on September 19, 2023. Supporting Documentation, ECF No. 136.

After careful consideration of the facts and evidence in this case, petitioner's Motion for Final Fees is **GRANTED in part and DENIED in part** for the reasons set forth below.

## I.    Background

### A.  Procedural History

A more detailed procedural history is contained in the Dismissal Decision issued on December 17, 2018 and incorporated herein by reference. ECF No. 106.

Petitioner was initially represented by James Blumenstiel and filed her petition on August 5, 2014 along with a compact disc containing Petitioner's Exhibits 1-15.[3] ECF No. 1. Additional medical records were ordered to be filed thereafter. ECF No. 8.

On April 16, 2015, petitioner filed a status report stating that she had submitted a settlement demand to respondent. ECF No. 23. Respondent immediately responded by filing a status report advising that petitioner had been informed prior to preparing a settlement demand that engaging in settlement discussions was not appropriate at this time. ECF No. 25.

Respondent then filed his Rule 4(c) Report on April 24, 2015, stating that "[p]etitioner has failed to proffer any medical opinion or theory supporting her allegations or establishing a logical cause and effect relationship between the flu vaccine and her alleged injuries." Report at 14, ECF No. 26. Respondent asked that the case be dismissed. *Id.*

At a Rule 5 status conference held on May 28, 2015, the then-Chief Special Master provided her preliminary views of the case and advised petitioner that an expert report would be required in order to establish petitioner's claims. *See* ECF No. 27. She also pointed out, among

---

[3] In addition to her medical records, the CD contained a Wage Loss Computation (Petitioner's Exhibit ("Pet. Ex.") 11), Payroll Records (Pet. Ex. 12), a Life Expectancy Chart (Pet. Ex. 13); a PDR Brochure on flu vaccines and an article by CDC on Guillain-Barré ("GBS") (collectively as Pet. Ex. 14).

other things, that petitioner's medical records showed that petitioner's injuries resolved in January 2013—three months after she received the flu vaccination—and that petitioner returned to work at that time. *Id.*

Additional medical records were filed in June and August 2015. Pet. Ex. 23-28, ECF Nos. 28, 34. On October 13, 2015, respondent filed a status report advising that he was not interested in any settlement discussions without an expert report in support of petitioner's claim. ECF No. 38.

This matter was reassigned to the undersigned on October 22, 2015. ECF No. 40.

On February 10, 2016, petitioner filed an expert report from Dr. Phillip DeMio and an "opinion letter" from Dr. Charles MacCallum, petitioner's treating physician. Pet. Ex. 29, 31, ECF Nos. 42-44. Petitioner filed additional records and an amended statement of completion on February 23, 2016. ECF Nos. 47, 49.

In a status report filed on May 11, 2016, respondent advised that he had provided a counteroffer to petitioner's April 2015 settlement demand. ECF No. 51. By status report filed on May 31, 2016, petitioner responded that respondent's counteroffer "of insignificant figures made it clear that settlement is not a realistic potential in this case." Petitioner suggested respondent depose Dr. MacCallum to "help clarify the evidence." ECF No. 52.

Prior to a status conference scheduled for June 29, 2016, respondent filed a status report highlighting the weaknesses in petitioner's case as contained in his Rule 4(c) Report and agreed it was "clear that settlement is not a realistic potential in this case." ECF Nos. 53, 54. Further, respondent noted that petitioner's expert Dr. DeMio's "practice focuses on the medical testing and treatment for you and/or loved one with Autism Spectrum Disorder" and Dr. MacCallum failed to offer any specific diagnosis for petitioner or a theory of causation as to how the flu vaccine could have caused petitioner's condition. *Id.* Respondent advised that efforts to resolve this matter were in good faith, but informal resolution did not appear possible. *Id.*

At the June 29, 2016 status conference, there was a detailed discussion about petitioner's claims which included petitioner's claim of a 24 hour onset of symptoms; lack of any definitive diagnosis or injury by any treating physician that was associated with the flu vaccine in the medical records; and lack of any documented treatment for the alleged injuries after January 2013, three months post-vaccination. ECF No. 55. Further discussed were the opinions and conclusions reached by Dr. DeMio in his report that the flu vaccine caused petitioner to suffer from autoimmunity, Guillain-Barré syndrome ("GBS"), and inflammatory arthritis. *Id.* Petitioner was ordered to file a supplemental report from Dr. DeMio that "include[d] specific references to the exact medical records, test results, and literature upon which [he] has relied in concluding that petitioner suffer[ed] from a vaccine-related injury." *Id.* at 2. Dr. DeMio was also ordered to address the three *Althen* prongs. *Id.* Also discussed was Dr. MacCallum's "opinion letter" in which he wrote, "there is no way to prove the cause and effect" between petitioner's symptoms and the flu vaccine, and "[e]valuation by rheumatology failed to unearth any significant autoimmune disease." *Id.* (citing Pet. Ex. 31).

3

Petitioner filed additional records on July 14, 2016 and a supplemental report from Dr. DeMio on September 20, 2016 along with medical literature. Pet. Ex. 35-41, ECF Nos. 56, 63. Dr. DeMio's supplemental report repeated his prior report without any citations or basis for his conclusions and failed to address the *Althen* prongs. *See generally* Pet. Ex 36; *cf.* Pet. Ex. 29.[4]

A status conference was held on October 25, 2016 to again discuss the merits of petitioner's case. Respondent advised of his intention to file a Motion to Dismiss. ECF No. 67.

Respondent filed a Motion to Dismiss on January 6, 2017, arguing that petitioner failed to demonstrate by preponderant evidence that (1) she suffered a medically-recognized injury; (2) she had any symptoms that persisted for more than six months as required by the Vaccine Act; and (3) that she had satisfied the causation requirements under *Althen*. Motion to Dismiss at 4-5, ECF No. 68. On January 23, 2017, Petitioner filed a copy of Dr. DeMio's Curriculum Vitae (Pet. Ex. 42), and a response to the Motion to Dismiss, arguing that petitioner's affidavits and medical records provided "an overwhelming amount of evidence" to satisfy the six-month requirement and *Althen*. Response to Motion to Dismiss at 13, ECF No. 70.

On April 21, 2017, I issued an Order that upon reviewing all the evidence again in order to address the Motion to Dismiss, petitioner had failed to comply with a prior Order (ECF No. 8) that required the filing of all petitioner's medical records prior to her receipt of the flu vaccine. The filed records referenced a history of arthritis (Pet. Ex. 4 at 1) and fibromyalgia (Pet. Ex. 5 at 9) making her records prior to vaccination necessary. Petitioner was ordered to file complete medical records by June 20, 2017. ECF No. 72. Respondent's Motion to Dismiss, along with petitioner's response, was not ruled upon because of the missing medical records.

Petitioner failed to meet the June 20, 2017 filing deadline. After two reminders from Chambers, J. Blumenstiel filed a "Response to the 4/21/17 Order" detailing the closing of his law firm, the exit of his secretary, and the disabling of his PACER account. ECF No. 74. Included therein was counsel's detailed analysis of the medical records, *his* opinions regarding her health prior to the alleged vaccinations, and *his* explanations for the contents of her medical records, including the references to arthritis and fibromyalgia. *Id.* at 2-3. A Non-PDF order issued on June 26, 2017 requiring petitioner to file an affidavit confirming that the medical records filed to date were complete, accurate, and contained all of her medical care for the five years prior to and since her vaccination. Non-PDF Order, dated June 26, 2017. She was also ordered to confirm that, despite the references in the record, she was not diagnosed with arthritis or fibromyalgia. *Id.* Petitioner filed her affidavit on July 20, 2017. Pet. Ex. 43, ECF No. 76.

On July 21, 2017, petitioner filed "Petitioner's Motion for a Hearing on Entitlement" arguing that Petitioner's Exhibits 1-43 supported a ruling in her favor. ECF No. 80 (improperly designated on the docket as "Stricken see Order filed 12/22/17"). Further, she "…believes the record is complete and the case is ready for a decision on entitlement… Thus, I file this Motion for Hearing on Entitlement during which we could depose Dr. MacCallum and… have Petitioner

---

[4] Petitioner's counsel continued to ignore the Vaccine Guidelines when filing documents throughout the next year, despite numerous reminders to consult the Guidelines. Consequently, the docket in this matter contains several erroneously filed documents and filings that were struck from the record. *See e.g.* ECF Nos. 60, 80, 93.

Kathleen Wyatt and her 2 adult daughters…offer their testimony…After said depositions, Petitioner would then ask this Court for a Ruling on Entitlement based on the Record and to allow briefs, if the parties so desire." *Id.* at 1-2.

Respondent filed his response on August 4, 2017, pointing out that his Motion to Dismiss filed on January 6, 2017 and petitioner's response was pending. Resp. Response at 1, ECF No. 81 (citing ECF Nos. 68, 70). He further noted that the Court had ordered petitioner to file additional medical records for at least three years prior to October 1, 2012. *Id.* (citing ECF No. 72, 76); Pet. Ex. 43. Additionally, the parties had been advised by an email from Chambers that testimony from Dr. MacCallum would be helpful to clarify some issues in petitioner's medical records. *Id.* Despite the foregoing, petitioner filed a Motion for a Hearing on Entitlement. *Id.* Respondent proposed that Dr. MacCallum's testimony be taken by telephone to conserve resources. *Id.* Further, the affidavits of petitioner and her daughters were already part of the record, therefore additional testimony would not assist in the special master's factual findings. *Id.* Respondent added that it was his position that "any hearing at this juncture would be for the limited purpose of ruling on respondent's pending Motion to Dismiss." *Id.* at 2. Finally, respondent submitted that should his Motion to Dismiss be denied, he would then submit rebuttal evidence regarding causation and entitlement, but based on the current record, petitioner's claim should be dismissed as it "lacks the factual and legal basis to establish petitioner's entitlement to compensation." *Id.*

A fact hearing was conducted on November 16, 2017 to hear testimony from petitioner's treating physician, Dr. MacCallum.[5] Prehearing Order, ECF Nos. 89, 90. On November 20, 2017, petitioner's counsel filed a status report advising that Braden Blumenstiel ("B. Blumenstiel"), his son, would be substituting as counsel of record. ECF No. 91. A Consented Motion to Substitute Attorney was filed on November 22, 2017. ECF No. 92. J. Blumenstiel filed an Application for Fees and Costs. ECF No. 93. B. Blumenstiel was advised that the Application for Fees and Costs was premature. Informal Communication, dated Dec. 19, 2017. Petitioner filed a Motion to Strike the Application for Fees and Costs which was granted. ECF Nos. 93, 96.

A status conference was held on January 18, 2018. At that time, I suggested that respondent move to strike the Motion to Dismiss and that petitioner file a Motion for Ruling on the Record so that all the medical records, affidavits, and testimony provided after the filing of the Motion to Dismiss could be addressed. Scheduling Order at 1, ECF No. 98. Respondent's counsel asked that petitioner file her Motion for Ruling on the Record and the Court render the Motion to Dismiss moot in the decision. *Id.* B. Blumenstiel then requested the opportunity to review and analyze the file to determine whether there were "any holes" in the record he needed to address before he filed the Motion for Ruling on the Record. *Id.* This prompted a discussion of the same issues discussed many times with J. Blumenstiel including that there was still (1) no diagnosis of any injury or illness causally related to the vaccine, and (2) no medical records filed supporting any illness or injury lasting longer than six months after vaccination. *Id.* B. Blumenstiel was specifically ordered to review the entire docket in this matter, all prior Orders issued, as well as all medical records, reports, and Dr. MacCallum's testimony. *Id.* He was to then file a status report in sixty days advising that he had in fact conducted a thorough review of the file and updating the Court on how petitioner intended to proceed. *Id.* Petitioner's counsel was reminded that contemporaneous

---

[5] Petitioner submitted additional filings before the Fact Hearing. ECF Nos. 82, 83, 85.

medical records carry more weight than the facts provided by petitioner in affidavits prepared years after the events took place. *Id.*

Rather than comply with the Court's Order, on March 15, 2018, B. Blumenstiel filed a status report stating that his review of respondent's Motion to Dismiss "demonstrates it is focused on the singular issue of whether petitioner's symptoms lasted the requisite six months after vaccination." ECF No. 99. Petitioner believed "that a ruling on the currently-pending motion to dismiss would provide guidance and assistance to the parties, and help narrow the disputed issues, as we work to bring this claim to a resolution." *Id.* Further, petitioner submitted that J. Blumenstiel had responded to the Motion to Dismiss arguing that petitioner's daughters' affidavits, the medical records, and reports from retained experts in this case demonstrated that her symptoms lasted the required six months to warrant compensation. *Id.* Petitioner asked that the Court rule on the pending Motion to Dismiss. *Id.*

An Order dated March 20, 2018 issued in response pointed out that petitioner's status report ignored several issues involving respondent's Motion to Dismiss. ECF No. 100. First, respondent's motion to dismiss was filed in January 2017, following which additional evidence was filed that had not been addressed therein. *Id.* Second, in the Motion to Dismiss, respondent argued that, in addition to the failure to meet the six-month requirement, petitioner failed to satisfy any of the *Althen* causation prongs. *Id.* (citing ECF No. 68). Third, a fact hearing was held in which petitioner's primary care physician, Dr. MacCallum, testified and that testimony needed to be addressed by petitioner. *Id.* Finally, the Court's ruling on the Motion to Dismiss was not an option offered to petitioner nor contemplated at the recent status conference. *Id.* To the contrary, counsel was ordered to review the record and all Orders previously entered in this matter with the instruction that petitioner would either "file a Motion for Ruling on the Record" addressing all the evidence now filed in the record or move for dismissal of the case. *See id.*[6]

On May 21, 2018, petitioner filed two identical exhibit lists, the second attaching a copy of the transcript of Dr. MacCallum's testimony as an exhibit. ECF Nos. 101-02. That same day, petitioner filed a Motion for Judgment on the Administrative Record. ECF No. 103. On June 4, 2018, respondent filed his Response. ECF No. 104. Petitioner filed a Reply on June 11, 2018. ECF No. 105.

On December 17, 2018, a Decision issued dismissing petitioner's claim for insufficient proof. Specifically, petitioner failed to prove by preponderant evidence that she suffered from a definitive vaccine-related injury or that any alleged injury lasted longer than six months. ECF No. 106.

On January 16, 2019, petitioner filed a Motion for Review pursuant to Vaccine Rule 23. Motion for Review, ECF. No. 108. Respondent filed a Response to petitioner's Motion for Review on February 15, 2019. ECF No. 110. On June 5, 2019, Judge Coster-Williams issued an opinion denying petitioner's Motion for Review. ECF No. 111; *Wyatt v. Sec'y Health & Human Servs.*, 144 Fed. Cl. 531, 533 (2018).

---

[6] Petitioner's counsel never filed a status report confirming that he reviewed the entire record as ordered.

On August 6, 2019, petitioner filed a Notice of Appeal to the Federal Circuit Court of Appeals. ECF No. 113.

On March 25, 2020, petitioner filed a second Motion for Interim Attorneys' Fees and Costs. Second Motion for Interim Fees, ECF. No. 115. In this Motion, B. Blumenstiel referred to the prior motion for fees filed on December 4, 2017, requesting attorney's fees and costs for J. Blumenstiel and incorrectly stating that it had been denied rather than stricken from the record on motion from counsel when advised it was premature. *See* ECF No. 96. Notably, none of the billing records filed in support of the First Motion for Interim Fees were refiled. *See generally* Second Motion for Interim Fees, ECF. No. 115.

After several Motions for Extension of time to respond, respondent filed his Response on July 23, 2020. ECF No. 119. Petitioner did not file a timely reply. On August 13, 2020, petitioner filed an untimely Motion for Extension of Time to file a reply. ECF No. 120. No explanation was given for the failure to comply with the Court-ordered deadline. The undersigned issued an Order granting petitioner's Motion for Extension of Time, stating in part that petitioner's counsel's routine disregard for Court-ordered deadlines would be addressed when handling his fee application. ECF No. 121. Petitioner filed her Reply on August 27, 2020. ECF No. 122.

On September 8, 2020, the Court of Appeals for the Federal Circuit issued a decision affirming the undersigned's decision and the Federal Court of Claims' denial of petitioner's Motion for Review.[7] *Wyatt*, 825 F. App'x at 888.

The Second Motion for Interim Fees and Costs was then denied as moot. Petitioner was instructed to file a Motion for Final Fees and Costs. ECF No. 125.

On March 29, 2021, petitioner filed a Motion for Final Fees and Costs. Motion for Final Fees, ECF Nos. 128-29. The Motion again requested fees for J. Blumenstiel without supporting documentation. For B. Blumenstiel, petitioner requested $24,142.55 in legal fees and $0.30 in costs. *Id.* In his Response on June 21, 2021, respondent raised reasonable basis arguing that the Motion for Final Fees should be denied. Response, ECF No. 133. Petitioner filed a reply on June 28, 2021. Reply, ECF No. 134.

Petitioner's counsel was advised by email from Chambers that the billing records for J. Blumenstiel previously stricken from the record had not been refiled; if he wanted them considered with the pending motion, those records needed to be filed. The records were filed on September 19, 2023, which documented $42,052.50 in legal fees for J. Blumenstiel and $5,081.77 in costs. Supplemental Documentation at 10-12, ECF No. 136.

---

[7] The Federal Circuit determined that there was sufficient evidence to support the diagnosis of polyarthritis. Nevertheless, the Court of Claims' denial of petitioner's Motion for Review was affirmed because the finding that petitioner failed to prove that she suffered from polyarthritis for at least six months was not arbitrary and capricious due to contemporaneous medical records indicating that her symptoms had resolved by February 2013. Pet. Ex. 10 at 1, 9; *see Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993). Further, the Federal Circuit determined the finding that the claim of polyarthritis failed because petitioner had not proven causation was not arbitrary and capricious. *Wyatt*, 825 F. App'x at 886-87.

This matter is now ripe for consideration.

**B. Summary of Relevant Medical Records[8]**

Petitioner had a past medical history of cancer and a host of other conditions but described her health and physical activities as better than most her age. Pet. Ex. 1 at 2; Pet. Ex. 20 at 5; Pet. Ex. 23 at 6.

Petitioner received the allegedly causal flu vaccine on October 1, 2012. Pet. Ex. 17 at 1; Pet. Ex. 5 at 10. She affirmed experiencing left hand and wrist discomfort the next day, October 2, 2012, or within a "few days" of receiving the vaccine. Pet. Ex. 1 at 5; Pet. Ex. 5 at 4; Pet. Ex. 17 at 1. She described "sharp shooting pain in [her] hands and forearms, initially beginning first in [her] left hand and arm then progressing to include [her] right hand and arm. . . It felt like [an] electric 'zap' that traveled from [her] hand . . . to [her] elbow." Pet. Ex. 17 at 1. Within 7-10 days following the vaccine, she began experiencing the pain and weakness she had initially felt in her upper extremities in her legs and feet. *Id.*

Petitioner returned to work on October 15, 2012, complaining about the symptoms she "developed since receiving the flu shot on October 1, 201[2]." Pet. Ex. 1 at 7; *see also* Pet. Ex. 17 at 2. Petitioner's supervisor sent her to the corporate health department, where a Vaccine Adverse Event Reporting System ("VAERS") report was filled out. Pet. Ex. 1 at 7; Pet. Ex. 4. The VAERS report stated that petitioner suffered from "[j]oint pain in lower + upper extremities radiating to upper torso affecting [activities of daily living]" beginning the afternoon of October 10, 2012. Pet. Ex. 4 at 1. Arthritis was listed as a pre-existing condition. *Id.* Petitioner was advised to follow up with her primary care physician for further treatment. Pet. Ex. 1 at 7.

Petitioner presented to her primary care provider, Dr. MacCallum, on October 16, 2012, reporting soreness from her hands up to her elbows and in her feet for the past week, as well as mobility issues in her fingers and fatigue. Pet. Ex. 5 at 9. Dr. MacCallum wrote that petitioner's symptoms started after a flu shot received two weeks prior to this visit and noted she had previously been diagnosed with fibromyalgia. *Id.* Bloodwork was performed and showed a positive ANA. *Id.* at 14. Dr. MacCallum referred petitioner to a rheumatologist, Dr. Lumapas. *Id.*

On October 28, 2012, petitioner presented to Ahuja Medical Center Emergency Department reporting that she was "walking down the stairs when she evidently missed 2 steps" heard "a pop on the left side and [has since] had pain in her left lateral malleolar area" as well as in her right ankle. Pet. Ex. 5 at 52. In her affidavit, petitioner affirmed telling the ER staff that the symptoms following her flu vaccine caused her fall, but the "busy staff member had gathered the minimal information needed to complete each line on their forms and nothing further was entered regardless of [her] continued explanation of the symptoms." Pet. Ex. 1 at 9. X-rays confirmed a fracture of her left ankle. Pet. Ex. 5 at 86.

At a follow up examination with the orthopedist, Dr. Corn, on November 1, 2012, petitioner reported that she "misjudged the bottom two steps [at her home] and fell injuring both ankles," which resulted in a comminuted but essentially nondisplaced left distal fibular fracture. Pet. Ex. 9

---

[8] A detailed medical history is provided in the dismissal decision.

at 8. Following his examination, Dr. Corn concluded petitioner's fracture would heal without surgical intervention. *Id*. He fitted her with a CAM walker boot and completed FMLA and short-term disability forms. *Id*. There is no mention of any complaints of pain and or weakness in petitioner's hands, arms, legs, or feet at this visit. *See id*.

Petitioner returned to Dr. Corn's office on November 13, 2012 at which time no significant change in her fracture pattern since the previous visit was noted. Pet. Ex. 9 at 5.

On December 5, 2012, petitioner presented to Dr. Anouchi for follow-up for left ankle fracture and right ankle sprain in Dr. Corn's absence due to vacation. Pet. Ex. 9 at 3. X-rays revealed a healing nondisplaced fracture of the right distal fibula. *Id*. Dr. Anouchi noted residual swelling in petitioner's left lateral ankle with tenderness to palpation along the fracture line. *Id*. He also noted some right ankle tenderness along the medial deltoid ligament. *Id*. She was instructed to continue wearing the boot when she was out of the house and given her job description, she could not return to work until the ankle was fully healed. *Id*. She was to follow up with Dr. Corn in four weeks. *Id*.

In a letter to Dr. Corn dated December 18, 2012, petitioner requested that he complete a travel insurance form, so she could extend her trip to her daughter. Pet. Ex. 9 at 32. She also wrote that she "continue[d] to experience joint pain in both [her] upper extremities as well as [her] lower extremities as [she] had been since [she] received her flu vaccine on October 1, 2012." *Id*. Dr. Corn submitted the form to petitioner's insurance company on December 21, 2012. *Id*. at 34.

On January 3, 2013, petitioner presented to rheumatologist Dr. Lumapas with painful joints, especially in her wrists. Pet. Ex. 10 at 10-16. She informed Dr. Lumapas that she had shooting pain in her thumbs from her wrists to her elbows and pain in her feet and lower legs, with shooting pain from her big toes to her heels. *Id*. Dr. Lumapas ordered a series of blood tests which was normal/negative except for a decreased white blood cell count, possibly caused by the medication petitioner took related to a prior cancer diagnosis and a positive ANA. *Id*. at 16; Pet. Ex. 7 at 31, 34, 54. Dr. Lumapas opined petitioner may have previously had a positive ANA along with some autoimmune disorder that could have been exacerbated by her October 2012 flu vaccine, but she was unsure if the vaccine was related to petitioner's current symptoms. *Id*. X-rays of petitioner's hands and right foot were ordered. *Id*. She instructed petitioner to follow up in two weeks. *Id*.

On January 8, 2013, petitioner returned to Dr. Corn for follow up. X-rays taken revealed "almost complete healing of the fracture." Pet. Ex. 9 at 1. He ordered follow up in one month. *Id*.

Petitioner returned to work on January 14, 2013 with minor restrictions. Pet. Ex. 8 at 15. Petitioner noted that once she returned to work, she noticed her hands and forearms hurt more than her legs. *Id*.

Petitioner returned to Dr. MacCallum on January 14, 2013, complaining of pain in her hands and metacarpophalangeal joints and shooting pain in her foot that began the day after the flu vaccine. Pet. Ex. 7 at 7. X-rays of petitioner's right hand revealed mild marginal osteophytosis at the first digit interphalangeal joint as well as the second through fifth digits distal interphalangeal

joints. Pet. Ex. 21 at 19. There were no periarticular erosive changes and no radiographic evidence of inflammatory arthritis. *Id*. However, in a letter to petitioner's employer exempting her from future required flu vaccines, Dr. MacCallum opined petitioner had "developed polyarthritis in her hands and feet after receiving a flu shot on 10/01/12 . . . and this obviates any further flu vaccines." Pet. Ex. 8 at 18.

Petitioner returned to Dr. Lumapas on January 17, 2013. Pet. Ex. 10 at 1. She complained of some joint swelling but was having less difficulty manipulating her hands. Dr. Lumapas opined that petitioner may have developed a reactive arthritis process after receiving the flu vaccine on October 1, 2012, but that "has now resolved." *Id*. at 9.

On February 1, 2013, Dr. Corn issued a Return to Work Authorization stating that petitioner could return to work on February 4, 2013 with no restrictions. Pet. Ex. 9 at 37. Petitioner had no further appointments with Dr. Corn or any other orthopedic specialist regarding the injuries related to the October 28, 2012 fall.

An Employee Incident Report was issued by Ahuja Workers Compensation on February 7, 2013, summarizing the events surrounding petitioner's allegedly causal flu vaccine. Pet. Ex. 8 at 24-25. The report stated petitioner "began experiencing [pain] and weakness [in] bilateral wrists and bilateral feet and toes with pain and weakness increasing requiring [petitioner] to seek adaptive ways to perform [her] job requirements." *Id*. at 25.

Petitioner had no further medical visits until September 14, 2013 when she presented to Dr. MacCallum's office with strep throat, left eye, ear, jaw, and facial pain. Pet. Ex. 7 at 194. She returned on September 30, 2013 for stress, anxiety, and a cold sore. *Id*. at 192. She presented to Dr. MacCallum's office three more times in December 2013 with fatigue and gastrointestinal issues. Pet. Ex. 26 at 5-9; Pet. Ex. 21 at 20-25. There were no complaints of myalgias, joint pain, joint swelling, or other issues.[9]

On February 12, 2014, petitioner presented for and passed her annual employer-mandated tuberculosis screening. *See* Pet. Ex. 21. Petitioner filled out the requisite form that accompanied the testing denying she suffered from any illness, extreme fatigue, weakness or other infirmity, or had any musculoskeletal problems such as weakness in her arms, hands, legs, or feet, or back pain, stiffness, or difficulty with activity. *Id*. at 6-7, 9.

There were no further medical visits filed until one year later, on February 21, 2015, when petitioner presented to Dr. MacCallum's office with possible allergies, tender right sinus, runny nose, sluggishness, a rash on her back, and joint pain. Pet. Ex. 26 at 4.

Eight months thereafter, on October 16, 2015, petitioner presented to Crystal Clinical Orthopedic ("Crystal" or "Orthopedic" or "CCO") with complaints of left hip pain following a fall in a parking lot on August 1, 2015.[10] *See* Pet. Ex. 34. She returned again on December 7, 2015 with hip pain and trouble ambulating. She denied numbness, tingling, fever, chills, neurological symptoms, or vomiting with no mention of any upper extremity pain or weakness. *Id*. at 11. An

---

[9] Petitioner affirmed that all her medical records had been filed. Pet. Ex. 43 at 1-2.

[10] Petitioner did not contend that this fall was related to the alleged vaccine injury. Pet. Ex. 34.

MRI on December 8, 2015 revealed a relatively large high grade partial tear of the distal gluteus medius tendon and trochanteric bursitis. *Id*. at 13.

On December 8, 2015, petitioner presented to neurologist Dr. Saltis with complaints of pain in her hands and feet that began after a flu vaccine in 2012. Pet. Ex. 32 at 1-2. She reported seeing a rheumatologist, but they "did not hit it off" so she did not return. *Id*. She advised that her workman's comp case "…determined she had a reaction to the flu vaccine which precipitated the fall" on October 28, 2012. *Id*. at 1. Physical and Neurologic Examination was normal but for decreased sensation of the left extremity with poorly downgoing plantars. *Id*. at 2. Although Dr. Saltis wrote that petitioner had a positive ANA and elevated CRP, no bloodwork results were filed. *Id*.

An MRI of the cervical spine performed on January 13, 2016, revealed small, broad-based disc protrusions at C2-3, C3-4, C5-6, and C6-7, without significant spinal stenosis, and bilateral foraminal narrowing at C5-6. Pet. Ex. 32 at 4. EMG/NCS study petitioner's bilateral upper extremities and left lower extremity performed on January 18, 2016, revealed mild axonal peripheral neuropathy with mild right carpal tunnel syndrome. *Id*. at 5.

On February 3, 2016, Dr. MacCallum wrote a letter addressed to James Blumenstiel stating that petitioner "started to develop extremity weakness, arthralgias, and difficulty walking up and down stairs," approximately one week after receiving a flu vaccine on October 1, 2012. Pet. Ex. 31 at 1. "[T]he most plausible explanation of [petitioner's] bizarre symptoms and persistent weakness would be an autoimmune reaction to the vaccine. Guillain [Barré] syndrome only occurs in one out of every million vaccines[,] but she certainly could be one that developed a variant." *Id*. However, "there is no way to prove the cause and effect" between petitioner's symptoms and the flu vaccine and "[e]valuation by rheumatology failed to unearth any significant autoimmune disease." *Id*.

Petitioner returned to Dr. Saltis on February 4, 2016 for her hip injury related to her August 1, 2015 fall. Pet Ex. 32 at 10-12. Dr. Saltis' assessment was polyneuropathy associated with underlying disease, monoclonal gammopathy, sensory disturbance, elevated C-reactive protein, and positive ANA. *Id*. at 11. Dr. Saltis did not relate any of these findings to the allegedly causal flu vaccine. *See id*.

On June 24, 2016, petitioner returned to Dr. MacCallum to "discuss vaccines and paperwork." Pet. Ex. 35 at 2. She complained of joint pain at this visit. *Id*. Dr. MacCallum wrote in response to J. Blumenstiel's request of him to summarize the "sequence of events that led to her terrible disability" that petitioner received the flu vaccine per corporate policy on October 1, 2012 and began developing pain in her left hand that progressed to her right hand and then lower extremities seven days later. *Id*. She continued to experience this pain and numbness in her extremities and has since developed atrophy in her hands. *Id*. She was referred to a rheumatologist and that rheumatology workup "was completely negative." *Id*. "The fact that there were no other precipitating factors [prior to the flu vaccine] seems to logically incriminate the vaccine as being the cause of petitioner's symptoms". *Id*. "We can see rare cases of Guiliian-Barré (sic) Syndrome and other neurologic problems as a result of vaccination." *Id*. "Unfortunately there can be no tests that can prove this, only the temporal relationship." *Id*. Dr. MacCallum diagnosed petitioner with

depression, inflammatory polyarthropathy, muscle spasticity, myalgia, polyneuropathy, and tingling in the extremities. *Id.* at 4. There was no objective testing or documentation provided to support any of these findings.

### C.  Fact Hearing

As a result of the content of Dr. MacCallum's office records and writings to J. Blumenstiel, a fact hearing was held on November 16, 2017 for his testimony.[11]

Dr. MacCallum was questioned about his office record for October 16, 2012. He recalled that petitioner "developed an upper extremity pain and also tingling in her upper extremities within a day of the immunization. It subsequently progressed to more generalized weakness and symptoms also involving her lower extremities." Tr. 9. He confirmed he did not see petitioner after her vaccine on October 1, 2012 until October 16, 2012, so he wrote that the onset of symptoms developed approximately a week after the vaccine. He later testified he was probably incorrect, and that her symptoms started earlier than a week after the vaccine. Tr. 51-52, 54-55, 67.  He then stated petitioner gave a history of her symptoms starting the night of the vaccine after she worked out but initially thought it was soreness from working out until the symptoms persisted and got worse. Tr. 10, 53-54. Dr. MacCallum stated, "[T]he initial soreness may have actually just been the soreness of the vaccine, you know, in her upper arm. Then subsequent to that, what developed over the subsequent days, I think, was an adverse reaction to the vaccine." Tr. 54. He acknowledged that in her worker's compensation report, she reported onset within 24 hours of the vaccine. Tr. 67.

Dr. MacCallum was unfamiliar with VAERS, but thought the symptoms listed in the VAERS and the "Employee Incident Report," which documented pain and weakness in bilateral wrists, feet, and toes with pain and weakness increasing after the flu vaccine coincided with her complaints. Tr. 14, 17-18; *see also* Pet. Ex. 4; Pet. Ex. 8 at 296. Dr. MacCallum stated that petitioner did not have arthritis prior to October 1, 2012. He believed the nurse preparing the VAERS report misinterpreted his office note of October 16, 2012 of polyarthritis as a preexisting condition. Tr. 15.

Dr. MacCallum then discussed his January 14, 2013 office record stating it was a follow up examination of her complaints after the flu shot and his opinion that she had an adverse reaction to the flu vaccine. Tr. 20-21; Pet. Ex. 7 at 195. In response to his note about her fall down the stairs, he stated, together "we made the assumption that it was due to the weakness in her hands and that she lost control of herself going down the stairs." Tr. 21. He confirmed his documenting that her symptoms began the day after the vaccine was based on the history she provided. Tr. 74-75.

Dr. MacCallum confirmed petitioner had no visits to his office between January 14, 2013 and September 14, 2013. Tr. 58-59, 63. He also confirmed that she was seen by members of his staff when she presented on September 14, 2013, September 30, 2013, October 30, 2013, December 9, 2013, then not again until February 21, 2015 and for visits unrelated to the alleged

---

[11] A more detailed summary of the hearing testimony can be found in the dismissal decision. Only relevant portions are included herein.

vaccine injury. Tr. 59-61, 64-65.  He confirmed there were no complaints of joint pain or weakness documented in any of those visits. Tr. 59-61; Pet. Ex. 7 at 190, 192, 194; Pet. Ex. 21 at 24-25; Pet. Ex. 26 at 4.

Dr. MacCallum conceded he did not see petitioner for over three years between her January 14, 2013 and June 24, 2016 visits. He did not receive any medical records that she saw any other providers during this time other than his office staff for unrelated issues. Tr. 65.

Dr. MacCallum was then asked about the June 24, 2016 visit "to discuss vaccines and paperwork. Pt. c/o joint pain today." Tr. 71; Pet. Ex. 35 at 2-3. While Dr. MacCallum stated he thought petitioner's complaints came from the vaccine, he conceded other things could have occurred during the time period when he had not seen her. Tr. 71.

J. Blumenstiel presented Dr. MacCallum with the insert for Fluarix. Tr. 28. Dr. MacCallum agreed that the insert stated that if one suffered from GBS within six weeks of the vaccine, another vaccine should not be given. Tr. 28-29; Pet. Ex. 14. He agreed that the insert discussed fatigue and arthralgias, two complaints made by petitioner. Tr. 28-30; Pet. Ex. 14 at 4.

Initially, Dr. MacCallum stated that petitioner had neuropathy, meaning that the nerve was malfunctioning, and brachial plexus neuropathy, which is in the upper chest, affecting the upper extremity and neck. Tr. 30-31. When asked why his records contained complaints in her hands and feet, he responded that when she first came to see him, she likely complained of soreness in her shoulder area which he documented as the upper extremity. Tr. 31. He later retracted his opinion that she had brachial neuropathy stating, "it really wasn't documented by nerve conduction studies." Tr. 55. It was pointed out to Dr. MacCallum that petitioner did have nerve conduction studies that showed carpal tunnel syndrome but no other neurological deficits. Tr. 56.

J. Blumenstiel presented the Vaccine Injury Table to Dr. MacCallum who confirmed that the Table listed an onset of GBS within three to 42 days of flu vaccine. However, Dr. MacCallum stated that petitioner did not have GBS. Tr. 34-36. "[I]t was not Guillain-Barré that she had, but the onset of an adverse reaction that occurred within that time frame." Tr. 36, 39. "I don't believe she had Guillain-Barré syndrome. I think that's the only identified adverse reaction in a neurological sense that they list in this table and then they talk about it having an onset within 3 to 42 days. That's all that's there." Tr. 36.

Petitioner's counsel insisted on questioning Dr. MacCallum about petitioner's GBS symptoms and presented Dr. MacCallum with articles about GBS and flu vaccine. Dr. MacCallum responded, "I do not believe this was Guillain-Barré. Guillain-Barré is just a good example of a neurologic disorder as an adverse reaction to a vaccination." Tr. 39.

Petitioner's counsel persisted, trying to get Dr. MacCallum to agree that petitioner's adverse reaction to the flu vaccine caused damage to her myelin sheath. Tr. 46. However, Dr. MacCallum refused, stating he "can't testify that her myelin sheaths have been damaged. All I can go by are her symptoms." Tr. 38, 47.  Further, he added no investigation into damage of the myelin sheaths was conducted. "We relied on rheumatologic opinion and neurology opinion that looked for other causes. But to my knowledge, nobody has any other ideas." Tr. 47.

Dr. MacCallum's statement in his letter to J. Blumenstiel that "the most plausible explanation of the bizarre symptoms and persistent weakness would be an autoimmune reaction to the vaccine" was raised.  Tr. 45. I asked Dr. MacCallum whether any of the specialists he referred petitioner to ever diagnosed her with any injuries related to the vaccine. He replied that they only documented the symptoms that she reported began following the flu vaccine. Tr. 47-48.

Finally, Dr. MacCallum confirmed that his opinion in this case was based solely on temporal relationship to the vaccine. Tr. 73-74.

### D. Petitioner's Expert Dr. DeMio[12] [13]

With no references to any medical records, Dr. DeMio provided a history that included uncharacteristic pain in the "left upper extremity including the hand" the day after petitioner's flu vaccine.  Pet. Ex. 29 at 1. Two weeks post-vaccine, petitioner "rapidly was in a state where she was unable to do her work functions, as noted by her and by her colleagues, due to pain, weakness, and dysesthesias in four extremities." *Id.* at 1-2. Over the months following the vaccine, petitioner received "full medical work-ups, leading to findings of pathology on tests [and] exams, and she was diagnosed with autoimmunity and inflammatory arthritis." *Id.* at 2.

Dr. DeMio then diagnosed petitioner with "autoimmunity with a minimally improved Guillian-Barré (sic) Syndrome, with severe persisting sequelae." Pet. Ex. 29 at 2. He opined that petitioner's symptoms and test results "clearly make the diagnosis of autoimmunity and Guillian-Barré (sic) Syndrome, and they exclude other diagnoses." *Id.* Dr. DeMio opined that "microbial antigens are thought to cause the molecular mimicry and to cross react immunologically with human peripheral nerve antigens leading to autoimmune attack on peripheral nerves, with resultant weakness, pain, and dysesthesias." *Id.* at 3. Dr. DeMio provided no references or support for his

---

[12] For a more detailed discussion of Dr. DeMio's opinion in this matter, please refer to the dismissal decision.

[13] Special Masters have criticized Dr. DeMio in the past for testifying in cases regarding medical theories which he is not qualified to render. *See Dia v. Sec'y of Health & Human Servs.*, No. 14-954, 2016 WL 6835549, at *1 (Fed. Cl. Spec. Mstr. Oct. 24, 2016) ("…Dr. DeMio's background is in autism, he did not explain his qualifications to opine about peripheral neuropathy."); *Holt v. Sec'y of Dep't of Health & Human Servs.*, No. 05-0136V, 2015 WL 4381588, at *16 (Fed. Cl. Spec. Mstr. June 24, 2015) ("[Dr. DeMio] is board certified in emergency medicine. He has no formal specialized training in . . . any of the several areas [pediatrics, immunology, neurology, or gastroenterology], in which he proffered opinions. His only publications involved chapters on arthritis, gout, inflammation, and nutrition in an integrative medicine textbook."); *Hughes v. Sec'y of Health & Human Servs.*, No. 16-930V, 2021 WL 839092, at *33 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) ("Overall, [Dr. DeMio] possessed serious credibility deficiencies…"). Dr. DeMio rendered opinions here in which he lacked the underlying requisite medical expertise. He lacks specialized training in both autoimmune and neurological disorders, and he has never conducted research or written papers in either field. Petitioner's counsel has been warned about Dr. DeMio rendering opinions but chose to continue with Dr. DeMio as the expert despite the warning. ECF No. 55; *see also Dia*, No. 14-954, 2016 WL 6835549, at *3 ("These factors should have made Mr. Blumenstiel pause before retaining Dr. DeMio. . . Mr. Blumenstiel is placed on notice that the undersigned is highly unlikely to award any compensation for work Dr. DeMio performs after the date of this decision.").

statements but rather relied solely on the timing of Ms. Wyatt's symptoms and "the lack of another temporally associated reasonable trigger" or cause, concluding that the flu vaccine was the sole cause of petitioner's current symptoms. *Id.*

I ordered a supplemental report from Dr. DeMio in which he was to provide references and support for his opinions as well as addressing each prong of *Althen,* otherwise, the report would be insufficient. ECF No. 55.

In a supplemental report, Dr. DeMio again wrote that petitioner has been diagnosed with "auto immunity (sic), inflammation, polyneuropathy, and arthritis." Pet. Ex. 36 at 1. He repeated that the flu vaccine can cause GBS, inflammation, and arthritis. *Id.* He included a list of five articles in support of this proposition but failed to explain the relevance of the articles to this case. *Id.* at 2. He referred generally to petitioner's medical records, without any reference to objective testing or any specific medical records to support his conclusion that petitioner suffered GBS, autoimmunity, inflammation, polyneuropathy, and arthritis caused by the flu vaccine received on October 1, 2012. *See generally id.* Furthermore, Dr. DeMio failed to discuss *Althen* or how this case satisfied the *Althen* prongs, despite the explicit order to do so. *See id.*; ECF No. 55.

Dr. DeMio's opinions were given little if any evidentiary value in the Decision dismissing the petition for lack of proof.

## II.    Discussion

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petition results in compensation, petitioner is entitled to reasonable attorneys' fees and costs. *Id.*; *see Sebelius v. Cloer*, 569 U.S. 369, 373 (2013). Where a petitioner does not prevail on entitlement, a special master has discretion to award reasonable fees and costs if the petition was brought in "good faith" and with a "reasonable basis" for the claim to proceed. § 15(e)(1). A petitioner's good faith is presumed "in the absence of direct evidence of bad faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Where no evidence of bad faith exists and respondent does not challenge petitioner's good faith, good faith requires no further analysis.

In the instant case, the undersigned has no basis to believe, and respondent does not argue, that petitioner did not bring her claim in good faith. Therefore, the undersigned finds that the petitioner brought her claim in good faith.

### A.  Legal Standard for Reasonable Basis

In discussing the reasonable basis requirement, the Federal Circuit stressed the prima facie petition requirements of § 11(c)(1) of the Act. *Cottingham ex. rel. K.C. v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1345-46 (Fed. Cir. 2020). Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

(1) received a vaccine listed on the Vaccine Injury Table;
(2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;

(3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
(4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
(5) has not previously collected an award or settlement of a civil action for damages for the same injury.

*Cottingham*, 971 F.3d at 1345-46.

Reasonable basis is an objective inquiry, irrespective of counsel's conduct or a looming statute of limitations, that evaluates the sufficiency of records available at the time a claim is filed. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017); *see Turpin v. Sec'y of Health & Human Servs*., No. 99-564, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). A special master's evaluation of reasonable basis focuses on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient objective evidence to make a feasible claim for recovery. *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121 at *7 (Fed. Cl. 2018).

Reasonable basis may be satisfied when there is more than a mere scintilla of objective evidence, such as medical records or medical opinions, supporting a feasible claim before filing. *See Cottingham*, 971 F.3d at 1346; *see Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)); *see Silva v. Sec'y of Health & Human Servs*., 108 Fed. Cl. 401, 405 (2012). A recent attempt to clarify what quantifies a "scintilla" looked to the Fourth Circuit, which characterized "more than a mere scintilla of evidence" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham v. Sec'y of Health & Human Servs.,* 154 Fed. Cl. 790, 795 (2021) (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 765 (4th Cir. 2021)). Additionally, absence of an express medical opinion of causation is not necessarily dispositive of whether a claim has a reasonable basis. Medical records may support causation even where the records provide only circumstantial evidence of causation. *James-Cornelius on Behalf of E.J. v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1379-80 (Fed. Cir. 2021).

Evaluation of reasonable basis is limited to the objective evidence submitted. *Simmons*, 875 F.3d at 636. Still, a special master is not precluded from considering objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018). In *Cottingham*, the Federal Circuit expressly clarified that special masters are permitted to utilize a totality of the circumstances inquiry in evaluating reasonable basis, including, but not exclusively limited to, objective factors such as those identified in *Amankwaa*. *See Cottingham,* 971 F.3d at 1344. The Federal Circuit reiterated that counsel conduct is subjective evidence not to be considered when evaluating reasonable basis. *Id*. at 1345. Counsel's attempt or desire to obtain additional records before filing is subjective evidence and does not negate the objective sufficiency of evidence presented in support of a claim. *James-Cornelius,* 984 F.3d at 1381. The Federal Circuit has additionally articulated that special masters cannot broadly categorize all petitioner affidavits as subjective evidence or altogether refuse to consider petitioner's sworn statements in

16

evaluating reasonable basis. *Id.* at 1380 (holding that factual testimony, when corroborated by medical records and a package insert, can amount to relevant objective evidence for supporting causation). However, a petitioner's own statements cannot alone support reasonable basis, and special masters may make factual determinations as to the weight of evidence. *See, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Human Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018); *Cottingham*, 971 F.3d at 1347.

While absent or incomplete records do not strictly prohibit a finding of reasonable basis, an overwhelming lack of objective evidence will not support reasonable basis. *Chuisano*, 116 Fed. Cl. at 288; *see Simmons*, 875 F.3d at 634-36 (holding that reasonable basis was not satisfied where 1) petitioner's medical record lacked proof of vaccination and diagnosis and 2) petitioner disappeared for two years before filing a claim). The objective evidence in the record must also not be so contrary that a feasible claim is not possible. *Cottingham*, 154 Fed. Cl. at 795, citing *Randall v. Sec'y of Health & Human Servs.*, No. 18-448V, 2020 WL 7491210, at *12 (Fed. Cl. Spec. Mstr. Nov. 24, 2020) (finding no reasonable basis when petitioner alleged a SIRVA injury in his left arm though the medical records indicated that the vaccine was administered in petitioner's right arm). A claim may lose reasonable basis as it progresses if further evidence is unsupportive of petitioner's claim. *See R.K. v. Sec'y of Health & Hum. Servs.*, 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1376–77 (Fed. Cir. 1994)).

Though a special master has broad discretion, they must keep in mind the Vaccine Act's remedial objective of maintaining petitioners' access to willing and qualified legal assistance, and a special master may not abuse their discretion in denying reasonable basis and fees. *See James-Cornelius*, 984 F.3d at 1381.

## B.  The Parties' Arguments

### 1.  Petitioner's Argument

Petitioner argues that a reasonable basis existed for the filing of her petition and throughout the pendency of the matter. Motion for Final Fees at 4; Reply at 1. According to petitioner, reasonable basis requires "very *minimal*" supporting evidence and the Court has been generous in awarding fees and costs. Reply at 3 (emphasis in original).

Petitioner submits that from the time the petition was filed, J. Blumenstiel then B. Blumenstiel met with petitioner, obtained affidavits, participated in status conferences, obtained expert reports, and conducted medical research. B. Blumenstiel "responded to a motion to dismiss, pursued a motion for review, and ultimately appealed petitioner's claim to the Court of Appeals." Motion for Final Fees at 4.[14]

Petitioner cites to evidence filed in support of each *Althen* prong, including a report from Dr. DeMio, a letter from Dr. MacCallum, and affidavits from petitioner and her daughters. Motion for Final Fees at 4-7; Reply at 4, 7-8.

---

[14] James Blumenstiel, not Braden, responded to the Motion to Dismiss. ECF No. 70.

Finally, petitioner submits that a reasonable basis existed for her claim because respondent made a settlement offer during the pendency of the claim. Motion for Final Fees at 7. "[P]etitioner believes the fact an offer of settlement was made is another factor which should be taken into consideration" and supports the granting of petitioner's request for fees. *Id.*

### 2. Respondent's Argument

Respondent argues that petitioner failed to establish a reasonable basis for her claim and the Motion for Final Fees should be denied. Response at 1. No challenge to good faith was raised.

Respondent submits that the reasonable basis analysis is an objective inquiry related to the factual basis of petitioner's claim. Response at 8, citing *Simmons*, 875 F.3d at 633-36. Petitioner failed to file more than a scintilla of objective evidence that she suffered a vaccine injury that lasted for more than six months. Response at 9.

Respondent points to the medical records as lacking any diagnosis of a persistent injury related to the vaccine. Response at 9. Petitioner failed to allege a cognizable injury but rather recited to various symptoms "unconnected to any particular condition." Respondent quoted the Federal Circuit's Decision in this case when it concluded that, "[T]he medical records were entirely bereft of proof that petitioner ever had a symptom of GBS." *Id.* at 9-10, citing *Wyatt*, 825 F. App'x at 885.

Further, respondent argues that petitioner failed to provide objective evidence that she suffered any injury for more than six months. Response at 10. "This statutory deficiency makes petitioner's claim completely infeasible and thus precludes a finding of reasonable basis." *Id.*

Finally, respondent argues that petitioner failed to offer a reliable medical theory linking her alleged injury to the flu vaccine received. Response at 10. Specifically, respondent objects to any award of fees related to Dr. DeMio "given his lack of qualifications to opine in this case; the absence [of] medical records to support the facts upon which he relied in forming his opinion; and his failure to disclose in his opinion that petitioner had been involved in an allegedly serious fall resulting in severe injuries prior to his examination of her." *Id.*, n. 6.

### III.    Analysis of Reasonable Basis

### A. Reasonable Basis When Filed

Consistent with *Cottingham*, petitioner has filed contemporaneous and facially trustworthy medical records demonstrating that petitioner received a covered vaccine, that the vaccine was administered in the United States, and that petitioner experienced symptoms she alleges are associated with her vaccine. 971 F.3d at 1345-46. Although I determined that petitioner failed to prove by preponderant evidence that she had a definable injury that satisfied the severity requirement, which was upheld by the Court of Federal Claims and Federal Circuit, for purposes of the lesser threshold for a finding of reasonable basis, there was some, albeit little, objective evidence that the petition was filed with a reasonable basis.

Petitioner's burden in establishing reasonable basis may be satisfied when there is "more than a mere scintilla of evidence" defined as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham,* 154 Fed. Cl. at 795 (quoting *Sedar*, 988 F.3d at 765). Petitioner need not prove causation to satisfy reasonable basis. *See* § 300aa-15(e)(1); *see also Chuisano*, 116 Fed. Cl. at 287; *P.S. v. Sec'y of Health & Human Servs*., No. 16-834V, 2022 WL 16635456, at *18 (Fed. Cl. Spec. Mstr. Oct. 6, 2022).

The records filed in this matter, although insufficient to prove entitlement, provided sufficient objective evidence to support reasonable basis for the filing of the petition. Petitioner received the allegedly causal flu vaccine on October 1, 2012. Pet. Ex. 17 at 1; Pet. Ex. 5 at 10. The records reflect that petitioner reported at different times onset of symptoms as occurring somewhere between 1-10 days following the vaccine. Pet. Ex. 4 at 1; Pet. Ex. 5 at 9; Pet. Ex. 7 at 7; Pet. Ex. 8 at 18, 24-25; Pet. Ex. 9 at 32; Pet. Ex. 10 at 9-16; Pet. Ex. 16; Pet. Ex. 31 at 1; Pet. Ex. 32 at 1-2; Pet. Ex. 35 at 2. Although the exact timing of onset remained unclear, petitioner always reported symptoms that occurred shortly after receipt of the subject vaccine as documented by her medical providers. *See id*. Further, the first documented complaint of her symptoms in the medical records was on October 16, 2012. Pet. Ex. 4 at 1. Following a long gap in treatment, during a visit with Dr. Saltis on December 8, 2015, petitioner provided a history which included ongoing[15] pain in her hands and feet associated with receipt of the subject vaccine. Pet. Ex. 32 at 1-2. Thus, while ultimately it was determined that that there was insufficient evidence to satisfy the six months requirement, there appeared to be a scintilla of evidence to support the filing of the petition.

While none of the foregoing was sufficient to prove entitlement, the records were sufficient to support petitioner's burden of showing more than a scintilla of objective evidence for the filing of the petition. *Cottingham,* 154 Fed. Cl. at 795 (quoting *Sedar*, 988 F.3d at 765). The filed medical records document a timeline that included complaints of symptoms beginning shortly after her receipt of the subject flu vaccine with several medical visits related to those complaints. Her primary care physician attributed her symptoms to the flu vaccine, referring her to a rheumatologist for further testing. He also wrote a letter exempting her from future flu vaccines. However, following long gaps between medical visits, other ailments and injuries, and years later, petitioner sporadically reported to some treating providers a history that included complaints she attributed to the subject vaccine, but no treatment was ever prescribed.

Therefore, more than a mere scintilla of objective evidence existed in the evidence filed to support the filing of the petition.

## B.   Reasonable Basis Lost After Fact Hearing

Although a claim may have a reasonable basis when filed, it may lose reasonable basis as it progresses if further evidence is unsupportive of petitioner's claim. *See R.K.,* 760 F. App'x at

---

[15] Petitioner made these complaints to Dr. MacCallum on June 24, 2016 at a visit seemingly prompted by petitioner's counsel. Pet. Ex. 35 at 3-4 ("I have been asked by [petitioner's] attorney to review the sequence of events that led to her terrible disability."). Additionally, Dr. MacCallum affirmed during the fact hearing that he had not seen petitioner for over three years prior to this visit, and he did not receive any medical records from other providers outside of his office during this timeframe. Tr. 65. Thus, the June 24, 2016 visit was not considered as part of the six months analysis herein.

1012 (citing *Perreira,* 33 F.3d at 1376–77). Here, petitioner's claim lost reasonable basis following the fact hearing on November 16, 2017.

Despite J. Blumenstiel's insistence that petitioner had GBS, petitioner's treating physician, Dr. MacCallum, denied she suffered from GBS. Tr. 36-39. Dr. MacCallum did believe petitioner suffered from polyarthritis following the flu vaccine, but he admitted he was unaware of EMG/NCS results that showed no abnormalities apart from carpal tunnel syndrome. Tr. 16-17, 53, 56; Pet. Ex. 32 at 5. Further, Dr. MacCallum agreed petitioner did not receive any diagnosis linking her symptoms to the vaccine by any physician, and he based his opinions on temporal relationship alone. Tr. 47, 73-74.

While a definitive diagnosis is not required to bring a claim in the Vaccine Program, continuing to argue and pursue claims that petitioner suffered a particular injury that her own treating physician and the medical records refuted defies reason. Nowhere in her medical records was petitioner ever diagnosed with GBS or autoimmunity related to the flu vaccine other than what was mentioned in letters from Dr. MacCallum to J. Blumenstiel, thus prompting the need for Dr. MacCallum's testimony, and by Dr. Lumapas who noted that her symptoms resolved three months after vaccination. Pet. Ex. 10 at 9. Thus, the injury argued by petitioner and contained in Dr. DeMio's reports did not have any support in the record for the continuation of her claim.

Dr. MacCallum conceded that he implicated the vaccine as the cause of petitioner's complaints based on temporal relationship alone. Tr. 73-74. He could not provide any explanation for how the flu vaccine caused her symptoms and was admittedly unqualified to do so. Tr. 45-47. Temporal relationship alone is insufficient to support a feasible claim of causation. *Grant v. Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992) ("When a petitioner relies upon proof of causation in fact rather than proof of a Table Injury, a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, petitioners must show a medical theory causally connecting the vaccination and the injury.").

Finally, petitioner retained Dr. DeMio as an expert to support her claim. For the reasons set forth in my Decision dismissing the petition, little weight was given to Dr. DeMio's opinions. ECF No. 106. The Court of Federal Claims upheld my determination that Dr. DeMio lacked the requisite medical expertise to render an opinion in this matter, and the Federal Circuit affirmed that determination. *Wyatt*, 144 Fed. Cl. at 538; *Wyatt*, 825 F. App'x at 880. Not only did Dr. DeMio lack the necessary qualifications to testify as an expert, he opined that petitioner suffered from conditions and/or injuries that were unsupported by the medical records. He referenced literature about conditions from which she did not suffer and failed to explain the relevance of the little medical literature he provided. He further failed to provide an analysis in support of the *Althen* prongs despite an explicit order to do so. As set forth at length above, Dr. DeMio's lack of expertise in rendering opinions, such as those provided here, has been addressed by the Court in several prior cases in which James and/or Braden Blumenstiel also served as petitioner's counsel.[16]

---

[16] *See supra* n. 13; *see also Lawrence v. Sec'y of Health & Human Servs.*, No. 14-835V, 2021 WL 5410246, at *2 (Fed. Cl. Spec. Mstr. Oct. 27, 2021); *Bailey v. Sec'y of Health & Human Servs.*, No. 15-1417V, 2020 WL 10486107 (Fed. Cl. Spec. Mstr. Apr. 24, 2020); *aff'd* 151 Fed. Cl. 396 (2020).

Petitioner argues that reasonable basis requires "very *minimal*" supporting evidence. Reply at 3 (emphasis in original). While counsel is correct that the burden is relatively low, the good faith and reasonable basis requirements make it clear that cases are not to proceed where there is no support for continuing the claim and Congress did not intend for every unsuccessful petitioner to be awarded fees for this reason. The Federal Circuit explained that an award of fees and costs is not warranted "by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury", which is the extent to which both Dr. MacCallum and Dr. DeMio opined. *See* § 15(e); *Perreira*, 33 F.3d at 1377. Petitioner's claim lost reasonable basis when her treating physician testified that she never had GBS, that there was no way to prove that the vaccine caused any of her symptoms, and that his opinion was based solely on temporal relationship. Tr. 36-39, 47, 56, 73-74; Pet. Ex. 31. In his reports, Dr. DeMio did nothing more than make unsupported diagnoses and reference medical literature that had no relevance to the evidence in this case. Pet. Ex. 29; Pet. Ex. 36. The sheer fact that petitioner's symptoms arose after a flu vaccine is insufficient to support a feasible claim of causation. Once it became clear that temporal proximity alone was the basis for the opinions in this matter, the claim lost reasonable basis.

For the above reasons, the undersigned finds that this petition had a reasonable basis when filed but lost reasonable basis following the fact hearing and Dr. MacCallum's testimony when it became clear that the first two *Althen* prongs lacked any support in the record. Although petitioner need not prove causation to be awarded fees, "the elements of reasonable basis and entitlement are intrinsically linked." *Cottingham*, 154 Fed. Cl. at 334 (explaining that reasonable basis is lacking when the claim is devoid "with respect to an element necessary to establish entitlement").

The foregoing shortcomings were discussed repeatedly with both J. Blumenstiel and B. Blumenstiel and memorialized in Orders and other filings with the Court. ECF Nos. 55, 67, 68, 98, 100. However, petitioner continued forward with her claim despite the lack of evidence to support doing so.

As a result, counsel will not be awarded any fees or costs in this case after March 19, 2018, by which point B. Blumenstiel had been given ample opportunity to review the case file in this matter and determine that reasonable basis ceased to exist following the fact hearing. Further, Dr. DeMio's costs will not be awarded because his opinions lacked any support in the record and his qualifications had been previously addressed by the Court several times including with this counsel and determined to be lacking.[17]

## IV.    Reasonable Attorneys' Fees and Costs

The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008). Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. *Id.* at 1348.

---

[17] *Id.*

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Human Servs.*, 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include in their fee requests hours, including those by paralegals, that are "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Id.* at 1522.

Furthermore, the special master may reduce a fee request sua sponte, apart from objections raised by respondent and without providing petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (2009). A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen*, 102 Fed. Cl. at 729.

In addition to fees, attorneys' costs must be reasonable as well. *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992) ("The conjunction 'and' conjoins both 'attorneys' fees' and 'other costs' and the word 'reasonable' necessarily modifies both. Not only must any request for reimbursement of attorneys' fees be reasonable, so also must any request for reimbursement of costs."). An expert retained by a petitioner in the Vaccine Program will only be compensated at a reasonable hourly rate, and petitioner has the burden of demonstrating that the expert costs incurred were reasonable. *Simon v. Sec'y of Health & Human Servs.*, No. 05-941V, 2008 WL 623833, at *2 (Fed. Cl. Spec. Mstr. Feb. 21, 2008).

## A. Reasonable Hourly Rates

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorneys' fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id.* This is known as the *Davis County* exception. *Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

For cases in which forum rates apply, *McCulloch* provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[18]

---

[18] The 2015-2023 Fee Schedules can be accessed at http://www.cofc.uscourts.gov/node/2914. The hourly rates contained within the schedules are updated from the decision in *McCulloch v. Sec'y of Health & Human Sers.,* No. 09-923V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).

Petitioner requested an hourly rate of $225 for J. Blumenstiel for 2012-2017. Supplemental Documentation at 3-10. I find this rate to be reasonable and consistent with what he has been previously awarded. *Lawrence*, No. 14-835V, 2021 WL 5410246, at *2; *Reginelli v. Sec'y of Health & Human Servs.*, No. 14–972V, 2016 WL 1161309, at *2 (Fed. Cl. Spec. Mstr. Mar. 1, 2016). B. Blumenstiel billed at an hourly rate of $225, which is consistent with what he has previously been awarded. Motion for Final Fees at 12-21; *Lawrence*, No. 14-835V, 2021 WL 5410246, at *2; *Bailey v. Sec'y of Health & Human Servs.*, No. 15-1417V, 2021 WL 4270225, at *2 (Fed. Cl. Spec. Mstr. Aug. 18, 2021). Petitioner also requested rates of $145 for paralegals and $150 for law clerks. Motion for Final Fees at 12-21. These requested rates are within the Vaccine Program's published range,[19] and thus, I find them to be reasonable. As such, no adjustment to any of the requested hourly rates is needed.

### B.  Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal. *O'Neill v. Sec'y of Health & Human Servs.*, No. 08-243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *McCulloch*, 2015 WL 5634323, at *26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *See Scott v. Sec'y of Health & Human Servs.*, No. 08-756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Human Servs.*, No. 14-1111V, 2016 WL 2853910, at *2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen*, 102 Fed. Cl. at 728-29 (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

Interim fees were not awarded in this case. Thus, the Motion for Final Fees requested reimbursement for fees and costs incurred since the inception of the case.

In total, petitioner requested $42,052.50 in fees for J. Blumenstiel and $5,081.77 in costs. Supplemental Documentation at 10-12. Significant reduction from the time billed by J. Blumenstiel is required. He billed his full attorney rate for time spent traveling, totaling 23.25

---

[19] *Id.*

hours. *Id*. at 3-10. While compensable, hours spent traveling are compensated at one-half of the hourly attorney rate. *See Scott*, No. 08-756V, 2014 WL 2885684, at *3. This results in a **reduction of $2,615.62**.[20]

Further, J. Blumenstiel billed his full attorney rate for non-attorney-level work, which is only compensated at a rate comparable to what would be paid for a paralegal in the Vaccine Program. *O'Neill*, No. 08-243V, 2015 WL 2399211, at *9. For example, he billed 1.5 hours in part for "fil[ing] [literature] with Court"; .75 hours for "fil[ing] DeMio report with Court"; .3 hours to "draft and file Notice of filing exhibits"; and .25 hours to "draft and file amended exhibit list". Supplemental Documentation at 3-10. He also billed his full attorney rate for clerical and secretarial tasks, which should not be billed at all. *McCulloch*, 2015 WL 5634323, at *26. For example, .25 hours for "Review of calendar for initial status conference and letter to Atty. Reynaud"; .25 hours for "draft[ing] Letters to drs."; 2 hours for "copy[ing] medical file and affidavits (sic) for Dr. DeMio Review"; 1 hour for "copy[ing] and highlight[ing] attachments to dr. ltr. And finalize status report"; .5 hours to "draft and file change of address"; .25 hours to "copy and address envelope to Resp. Att. For mailing Notice of Change of Address"; 2.15 hours to "scan all previously filed exhibits with the 3 year prior records"; .5 hours to "file scanned prior exhibits that had the 3 year prior records"; 1.6 hours in part to "mark and scan 3 exhibits"; 2.8 hours to "review & copy affidavits & other docs. For Dr. MacCallum's deposition + letter & mail"; and .9 hours to "draft/ send emails coordinating the video conf. depo. w/ technician/ct. rep. and Dr." Supplemental Documentation at 3-10. J. Blumenstiel additionally billed for time spent doing research on basic vaccine caselaw (.75 hours to "review and outline althen l;egal (sic) holdings"), which is not compensable. *Id*. at 8; *Matthews*, No. 14-1111V, 2016 WL 2853910, at *2.

Finally, J. Blumenstiel requested reimbursement for hours expended on claims separate from petitioner's vaccine injury claim. He billed a total of 10.6 hours for a worker's compensation claim and employment claim. Supplemental Documentation at 3-10. Although these claims are related to her alleged vaccine injury, they are not part of her vaccine injury claim and are thus not compensated by the Vaccine Program.

In addition to what was requested for J. Blumenstiel, petitioner requested $24,142.55 in fees related to B. Blumenstiel's representation and $0.30 in costs. Motion for Final Fees at 8. As detailed above, I determined that this case lost reasonable basis following the fact hearing. Detailed discussion was had with B. Blumenstiel when he substituted in as counsel following the hearing. On January 18, 2018, B. Blumenstiel was ordered to review the case and all the Orders entered in this matter and file a status report that confirmed that he had done so. ECF No. 98. He failed to file a status report that confirmed his review of the file, and despite discussions, respondent's pending Motion to Dismiss, and the testimony of Dr. MacCallum that petitioner did not have GBS or any other definable injury resulting from her flu vaccine and admitting that his opinions were based on temporal relationship alone, counsel continued to pursue the claim. Thus, B. Blumenstiel will be paid only for the time spent up to March 19, 2018, the deadline set for him to file the status

---

[20] This number is reached by multiplying the hours spent (23.25) by J. Blumenstiel's hourly rate ($225), which totals $5,231.25. That total is then divided in half, for a sum of $2,615.62.

report confirming his review of the evidence and all the Court's prior Orders in this matter. *See* ECF Nos. 98-99. This results in a **reduction of $23,089.55**.[21]

Although fees and costs will not be awarded past March 15, 2018,[22] I would be remiss in not addressing the billing submitted by B. Blumenstiel for time not compensable in the Program.[23] Among other items, B. Blumenstiel billed for: 1.2 hours for "Research[ing] whether a petitioner can appeal a judge's decision denying a motion for review"; 2.6 hours for "Research[ing] deadline to file appeal. Phone conferences with clerk of courts of court of claims and appellate court to determine timing of filing notice of appeal and where to file the notice"; 1.9 hours for going to the Ohio Supreme Court "to get certificate of good standing so I can apply for admission to the U.S. Court of Appeals for the Federal Circuit"; 2.4 hours for drafting and filing a "motion for admission to federal appellate court"; .7 hours on August 23, 2019 with no explanation as to how the time was spent; and 3.5 hours in part for "Conduct[ing] research on appealling (sic) to the United States Supreme Court". Motion for Final Fees at 12-22.

While counsel may be awarded fees and costs associated with preparing an appeal, "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program," including conducting research on the appellate process for vaccine claims. *Matthews*, No. 14-1111V, 2016 WL 2853910, at *2; *Davis v. Sec'y of Health & Human Servs.*, No. 07–451V, 105 Fed. Cl. 627 (2012); *Chuisano*, 116 Fed. Cl. at 293. Further, fees and costs related to counsel's bar admission are not compensable. *See, e.g.*, *Raymo v. Sec'y of Health & Human Servs.*, No. 11–654V, 2016 WL 7212323, at *12-*13 (Fed. Cl. Spec. Mstr. Nov. 2, 2016) (denying such fees); *Oswalt v. Sec'y of Health & Human Servs.*, No. 03-2153V, 2011 WL 2149932, at *13 (Fed. Cl. Spec. Mstr. May 2, 2011) (characterizing admission to practice before this new jurisdiction as a "professional enhancement"); *Velting v. Sec'y of Health & Human Servs.*, No. 90-1432V, 1996 WL 937626, *1-2 (Fed. Cl. Spec. Mstr. Sept. 24, 1996) (following past cases where special masters reasoned that the bar admission "conferred an ongoing benefit upon counsel"). Counsel is therefore again warned against billing for impermissible tasks in the future.

In total, petitioner requested $66,195.05 in attorneys' fees. With all reductions, including a 10% reduction from the total fee award to account for the numerous erroneous billing entries, petitioner is awarded $36,440.90[24] in attorneys' fees.

---

[21] This total is reached by adding B. Blumenstiel's three billing entries on and prior to March 15, 2018, totaling $1,053 (this number represents all that B. Blumenstiel will be paid for his work on this matter). Subtracting that number from the total fee request for B. Blumenstiel ($24,142.55) equals a total reduction of $23,089.55.

[22] Although petitioner's deadline was set for March 19, 2018, she filed her status report early on March 15, 2018. ECF Nos. 98-99.

[23] This is particularly notable due to B. Blumenstiel touting his experience in handling vaccine cases in affidavits to this Court. ECF No. 91; *see also Hoffman Estate of Christner v. Sec'y of Health & Human Servs.*, No. 16-1122V, 2023 WL 3092668, at *3 ("The Motion [to Substitute Attorney] was accompanied by an affidavit of petitioner affirming that James Blumenstiel had been practicing law with his son, Braden Blumenstiel, for the past 13 years and that Braden Blumenstiel had 'focused a portion of his practice of law on representing those rare individuals who suffered adverse reactions to a vaccine.'")

[24] This total is reached by subtracting $2,615.62 (to account for the overcharge in travel time) and $23,089.55 (fees for B. Blumenstiel following March 15, 2018) from $66,195.05 (the total fees

### C.  Costs

In total, petitioner requested reimbursement of $5,082.07 in costs. Motion for Final Fees at 8; Supplemental Documentation at 11-46.

Petitioner requested reimbursement of costs associated with her expert, Dr. DeMio. As discussed previously, Dr. DeMio will not be paid by the Vaccine Program for his work in this case. He has been admonished by other special masters and his opinions in other cases have been given little to no weight. Counsel was on notice that Dr. DeMio has been found not credible in the Program because those decisions are publicly available and, more importantly, the Blumenstiels handled several of those prior cases with Dr. DeMio as the expert.[25] Further, Dr. DeMio did not detail how he spent his time; rather, he submitted a vague invoice of $2,892.75 for "Record Review (CPT-99091), exam and report". Supplemental Documentation at 21. For the foregoing reasons, petitioner will not be reimbursed for any costs related to Dr. DeMio, resulting in a **reduction of $2,892.75**.

Petitioner also requested miscellaneous costs, such as costs associated with medical record requests and the filing fee. I find these costs to be reasonable and supported by the receipts filed. Thus, I will award them in full.

### V.    Conclusion

Based on the foregoing, petitioner's Motion for Final Attorneys' Fees is **GRANTED in part and DENIED in part.** The undersigned finds that it is reasonable to compensate petitioner and her counsel for a **total award of attorneys' fees and costs in the amount of $38,630.22**.

Accordingly, the undersigned awards:

> A lump sum payment of $38,630.22, representing reimbursement for petitioner's attorneys' fees and costs in the form of a check payable jointly to petitioner and her counsel of record, Braden Blumenstiel of The Law Office of DuPont & Blumenstiel.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[26]

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michaels Roth
Special Master

---

requested), then multiplying that number by .90 (to account for the 10% reduction for the numerous errors in billing).

[25] *See supra* n. 13.

[26] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.